**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CASE NO. 3:03CR152 (PCD)** |
| **Plaintiff** | : | |
| | : | |
| **V.** | : | |
| | : | |
| | : | |
| **ROBERT L. KELLER, JR.** | : | |
| **Defendant** | : | **MARCH 22, 2005** |

<u>**DEFENDANT'S MEMORANDUM IN AID OF SENTENCING**</u>

**I.    INTRODUCTION**

The Defendant, **ROBERT L. KELLER, JR.,** in accordance with Rule 32(o) of

the Local Rules of Criminal Procedure, submits this memorandum in aid of

sentencing scheduled for March 31, 2005 at 1:00 p.m.

On September 1, 2004, Mr. Keller pleaded guilty to Counts One (mail fraud)

and Seven (conspiracy to defraud the Internal Revenue Service) of the indictment, in

violation of 18 U.S.C. §§ 1341 and 371, respectively.  The parties entered into a Plea

Agreement Letter dated September 1, 2004.  Mr. Keller and the Government

disagree as to the Federal Sentencing Guidelines calculations.[1]  Specifically, the

Government contends that that Mr. Keller's Total Offense Level, after a reduction for

acceptance of responsibility, is 16.  *See* Presentence Report, ¶ 6.  Conversely, Mr.

Keller maintains that his Total Offense Level, after a reduction for acceptance of

---

[1] *See* Part II, *infra*, regarding the applicability of the Federal Sentencing Guidelines.

responsibility, is 13.  Mr. Keller concurs with the Government that his Criminal History

Category is Level I.

Mr. Keller respectfully submits that factors exist which make his case

appropriate for a sentence below the Guidelines range, and that the appropriate

sentence is one in which Mr. Keller is placed on probation.  The grounds for a

sentence below the Guidelines range are as follows:

1.    Mr. Keller's case is outside the "heartland" of cases for the instant offenses;

2.    Mr. Keller's actions constituted aberrant behavior;

3.    Mr. Keller's extraordinary charitable and employment-related contributions and numerous good deeds warrant sentence below the Guidelines range;

4.    Because there are extraordinary family circumstances present, a sentence below the Guidelines range is justified so that Mr. Keller may maintain the necessary emotional commitment and support for his ailing father;

5.    A combination of factors supports a sentence below the Guidelines range.

## II.    THE APPLICABILITY OF THE FEDERAL SENTENCING GUIDELINES

Since Mr. Keller's guilty plea, the law governing federal sentencing has

changed significantly.  In the recent case of *United States v. Booker*, 125 S.Ct. 738

(2005), the United States Supreme Court held, in the first of two majority opinions,

that the Sixth Amendment is violated when an enhanced sentence is imposed under

the Guidelines based upon judicially determined facts.  *Id.* at 756.  In the second

majority opinion, a different majority of the Court concluded that based upon the first majority's constitutional holding, the appropriate remedial measure required the severance and excision of two provisions of the federal sentencing statute, including 18 U.S.C. Section 3553(b)(1), the provision that made the Federal Sentencing Guidelines mandatory. *Id.* at 756-57. As such, the Court stated that so modified, the Guidelines were to be considered advisory rather than mandatory. *Id.* at 757. Thus, while the federal sentencing statute "requires a sentencing court to consider Guidelines ranges, … it permits the court to tailor the sentence in light of other statutory concerns as well…." *Id.*

In accordance with *Booker* and the mandate of 18 U.S.C. Section 3553(a), a district court must consider a variety of factors in imposing a sentence, including: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to satisfy certain articulated purposes such as to reflect the seriousness of the offense, to provide deterrence, or to protect the public; (3) the kinds of sentences available; (4) the kinds of sentences and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the Guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to

3

any victims of the offense.  18 U.S.C. § 3353(a); *see also United States v. West*, 2005 WL 180930, at *2 (S.D.N.Y. Jan. 27, 2005) (citing *United States v. Ranum*, 353 F. Supp.2d 894 (E.D. Wis. 2005).

The ruling in *Booker* directs courts to consider all of the Section 3553(a) factors, many of which the Guidelines either reject or ignore.  *United States v. Ranum*, 353 F. Supp. 2d at 985-86.  For example, pursuant to Section 3553(a)(1), a sentencing court must consider the "history and characteristics" of the defendant.  *Id.* at 986 (quoting 18 U.S.C. § 3553(a)(1)).  However, under the Guidelines, courts are generally forbidden to consider a defendant's age; U.S.S.G. § 5H1.1; his education; *id.* § 5H1.2; his mental and emotional condition; *id.* § 5H1.3; his physical condition; *id.* § 5H1.4; his employment record; *id.* § 5H1.5; his family ties and responsibilities; *id.* § 5H1.6; his socio-economic status; *id.* § 5H1.10; and his civic contributions; *id.* § 5H1.11.  *United States v. Ranum*, 353 F. Supp. 2d at 986.

The *Ranum* court stated:

> The guidelines' prohibition of considering these factors cannot be squared with the § 3553(a)(1) requirement that the court evaluate the 'history and characteristics' of the defendant.  The only aspect of a defendant's history that the guidelines permit courts to consider is criminal history.  Thus, in cases in which a defendant's history and character are positive, consideration of all of the § 3553(a) factors might call for a sentence outside the guideline range.

*Id.*  The *Ranum* court further noted that Section 3553(a)(7) directs courts to consider the need to provide restitution.  *Id.*  The court noted, "In many cases, imposing a

sentence of no or only a short period of imprisonment will best accomplish this goal

by allowing the defendant to work and pay back the victim.  The guidelines do not

account for this.  In fact, the mandatory guideline regime forbids departures to

facilitate restitution."  *Id.* (citing *United States v. Seacott*, 15 F.3d 1380, 1388-89 (7[th]

Cir. 1994).  The Second Circuit has also noted that the non-mandatory nature of the

Guidelines now makes it unnecessary for a sentencing judge to adhere strictly to

Guidelines ranges that are dependent upon precise calculations of monetary losses.

*United States v. Crosby*, 397 F.3d 103, 112 (2d Cir. 2005).

> The Second Circuit has stated:

> [T]he excision of the mandatory aspect of the Guidelines does not
> mean that the Guidelines have been discarded.  On the contrary,
> sentencing judges remain under a duty with respect to the Guidelines –
> not the previously imposed duty to apply the Guidelines, but the
> continuing duty to "consider" them, along with the other factors listed in
> section 3553(a).

*Id.* at 111.  The guidelines are to be treated "as just one of a number of sentencing

factors."  *United States v. West*, 2005 WL 180930, at *2.  "[C]ourts are free to

disagree, in individual cases and in the exercise of discretion, with the actual range

proposed by the guidelines, so long as that the ultimate sentence is reasonable and

carefully supported by reasons tied to the § 3553(a) factors."  *United States v.

Ranum*, 353 F. Supp. 2d at 987; *see also United States v. Jones*, 352 F. Supp.2d 22,

25-26 (D. Me. 2005) (reviewing the factors identified in subsection 3553(a) "in

determining whether to apply the now advisory Guidelines" and concluding that the Guidelines would not be followed under the circumstances of the case).

The Second Circuit has ruled that in order to fulfill its statutory duty to consider the Guidelines, a sentencing judge will normally have to determine the Guidelines range applicable to the offense. *United States v. Crosby*, 397 F.3d at 111. "A judge cannot satisfy this duty by a general reference to the entirety of the Guidelines Manual, followed by a decision to impose a 'non-Guidelines sentence.'" *Id.* A judge is further permitted to engage in any fact-finding necessary for consideration of the Guidelines and Section 3553(a). *Id.* at 112.

The Second Circuit summarized the issues that must be considered by a sentencing judge after *Booker*:

> First, the Guidelines are no longer mandatory. Second, the sentencing judge must consider the Guidelines and all of the other factors listed in section 3553(a). Third, consideration of the Guidelines will normally require determination of the applicable Guidelines range, or at least identification of the arguably applicable ranges, and consideration of applicable policy statements. Fourth, the sentencing judge should decide, after considering the Guidelines and all the other factors set forth in section 3553(a), whether (i) to impose the sentence that would have been imposed under the Guidelines, *i.e.*, a sentence within the applicable Guidelines range or within permissible departure authority, or (ii) to impose a non-Guidelines sentence. Fifth, the sentencing judge is entitled to find all the facts appropriate for determining either a Guidelines sentence or a non-Guidelines sentence.

*Id.* at 113.

Therefore, for the purposes of this Memorandum, although their application is not mandatory, Mr. Keller addresses various factors that are set forth in the Federal Sentencing Guidelines, as well as the case law interpreting those factors, as a framework for his arguments and in order to assist the Court in considering the Guidelines.  The arguments advanced by Mr. Keller also fall squarely within the points that this Court is required to consider pursuant to 18 U.S.C. Section 3553(a).

## III.    DEFENDANT'S VERSION OF THE OFFENSE AND CALCULATION OF LOSS AND GUIDELINES RANGE

### A.     Mr. Keller's Version Of The Offense

A good portion of the money at issue in this case was spent for legitimate New York Life business-related expenses.  The practice of pre-paying businesses with whom New York Life had a relationship was a custom that was in place at New York Life prior to Mr. Keller being hired; it was a global practice throughout the Information Technology Department at New York Life.  Mr. Keller was instructed by his superiors to have Softcraft invoice New York Life for services that had not yet been rendered but were likely to be rendered in the coming year.  Thus, following this New York Life custom and at the direction of his superiors, Mr. Keller pre-paid Softcraft with the funds at issue in this case.  The "surplus" paid to Softcraft was then used for a variety of purposes, many of them legitimate and business-related.

When Mr. Keller was hired at New York Life, he was brought in to work aggressively on emerging information technology projects for which there was little or

7

no funding.  Mr. Keller's projects always had very short time frames for execution and there were very high expectations for success.  When he started, Mr. Keller was told to approach his position as if he were working in a start up company.  Mr. Keller was encouraged by his superiors to think outside the box and work outside of New York Life traditional guidelines when it came to funding and completing various projects.

For example, Mr. Keller was charged with performing an evaluation of a new internet-based software development environment/application.  Because this project was not originally forecasted or funded, Mr. Keller decided to have Softcraft perform the analysis.  This required the immediate procurement of expensive computer hardware, software and human resources.  The expense for the computer hardware was in excess of $150,000.  The software for the project totaled over $125,000.  Additional operating system software, database software and setup support was estimated at an additional $135,000.  None of this hardware or software was procured through traditional New York Life procedures as it would have taken six to nine months to get the necessary approvals and obtain the equipment from approved New York Life vendors.  Mr. Keller was charged with having a project result within three months.  Thus, money from the surplus paid to Softcraft was used to fund the acquisition of the necessary hardware and software to complete this project in the expedited fashion that was expected by Mr. Keller's superiors.  Softcraft procured the

necessary equipment for the project and billed it back to New York Life as consulting services.

Another example of how Mr. Keller was encouraged to use non-traditional methods to complete his projects is illustrated by the ongoing software conversion projects that he performed. These projects had funds allocated to them; however, after performing an analysis as to a particular project, Mr. Keller determined that additional funds were required to complete the project. Specifically, Mr. Keller was tasked with converting entire software development teams of employees over to an application that would structure their development team and software such that it could be tracked and archived. The employees within the development teams for whom Mr. Keller was providing this service were not particularly interested in this aspect of their jobs and, as a consequence, Mr. Keller received little or no support from them in the performance of his duties. Therefore, the consulting expenses required for the projects were always higher than the budgeted amount and Mr. Keller needed to find a way to cover these additional expenses. Money from the "surplus" was used in these types of situations.

The Government claims that there are six invoices that make up the amount of the loss as follows: Invoice No. 980063 for $74,970.00, Invoice No. 980064 for $74, 981.25, Invoice No. 980065 for $49,983.75, Invoice No. 990138 for $39,960.00, Invoice No. 990150 for $39,525.00 and Invoice No. 990151 for $39,525. These six

invoices total $318,945.  Upon information and belief, this total represents every dollar that went into the surplus no matter how it was spent.  Mr. Keller disputes this calculation of loss because it assumes that there was no legitimate purpose for setting up the surplus.

Contrary to the position of the Government, Mr. Keller maintains that the amount of the loss should be calculated by totaling the payments made directly to him or his creditors as outlined in the Pre-Sentence Report and Indictment.  These payments are as follows:

| DATE | AMOUNT | TYPE OF PAYMENT | REFERENCE |
|------|--------|-----------------|-----------|
| July 16, 1999 | 3,500.00 | cashier's check | PSR ¶ 20; Indictment p. 17, ¶ F |
| Nov. 1999 | 10,123.00 | Michael's Jewelers | PSR ¶ 38; Indictment p. 17, ¶ I |
| Dec. 3, 1999 | 5,000.00 | cashier's check | Indictment p. 18, ¶ O |
| Dec. 21, 1999 | 5,982.90 | Amex | PSR ¶ 23; Indictment p. 19, ¶ U |
| Dec. 21, 1999 | 5,742.59 | Amex | PSR ¶ 23; Indictment p. 19, ¶ U |
| May 2, 2000 | 4,700.00 | Amex | PSR ¶ 26; Indictment p. 20, ¶ AA |
| May 2, 2000 | 4,280.00 | Amex | PSR ¶ 26; Indictment p. 20, ¶ AA |
| May 17 & 26, 2000 | 7,500.00 | money order | PSR ¶ 27; Indictment p. 20, ¶ BB |
| June 26, 2000 | 5,218.00 | Amex | PSR ¶ 30; Indictment p. 21, ¶ EE |
| June 26, 2000 | 5,723.00 | Amex | PSR ¶ 30; Indictment p. 21, ¶ EE |
| July 30, 2000 | 1,472.15 | SNET | PSR ¶ 31; Indictment p. 21, ¶ FF |
| " | 5,215.80 | money order | " |
| " | 8,818.56 | money order | " |
| " | 8,972.78 | money order | " |

| | | | |
|---|---|---|---|
| Sept. 13, 2000 | 4,500.00 | Amex | PSR ¶ 32; Indictment p. 21, ¶ HH |
| Mid-Nov. 2000 | 1,500.00 | Visa | PSR ¶ 33; Indictment p. 21-22, ¶ II |
| " | 3,000.00 | Mastercard | " |
| " | 3,000.00 | Amex | " |
| " | 3,000.00 | Amex | " |
| " | 6,000.00 | cashier's check | " |
| Dec. 8, 2000 | 1,500.00 | Visa | PSR ¶ 33; Indictment p. 21-22 ¶ II |
| " | 3,000.00 | Mastercard | " |
| " | 2,000.00 | Amex | " |
| " | 2,000.00 | Amex | " |
| " | 6,000.00 | cashier's check | " |
| Nov. 1999 to Jan. 2001 | 3,000.00 | DirecTV (Keller's share of $9,000 charge for 3 people) | PSR ¶ 39 |
| | 120,748.78 | | |

Thus, the total amount of payments to Mr. Keller and his creditors total
$120,748.78.  However, Mr. Keller maintains the legitimacy of many of the
expenditures from this total.  For example, much of the money paid to Mr. Keller from
the surplus represented reimbursement for company-related expenses.  While at
New York Life, Mr. Keller's staff grew from five to 70 people.  Mr. Keller routinely
bought gifts for his employees as morale-boosters such as inspirational or self-
improvement books, employee luncheons and dinners, weekly breakfast meetings,
wristwatches and pens bearing the New York Life logo, and ice cream parties.  Mr.
Keller also provided bonus-type gifts to employees who went above and beyond
during the course of various projects, such as American Express gift cards.  Mr.

11

Keller further used the surplus to reimburse himself for work-related travel expenses to trade conferences.

Other examples of how Mr. Keller used the money from the surplus are specific to particular employees. One employee was putting in many extra hours on a particular project and had a bad back. Thus, Mr. Keller used money from the surplus to buy her a new office chair for her back. Additionally, Mr. Keller had a particularly valuable employee who was going through a divorce and could not afford a monthly train ticket to commute to work. As this employee was a key contributor to an important project, Mr. Keller could not afford to have this employee miss work. Thus, Mr. Keller paid for the employee's monthly train pass with money from the surplus.

With all of these employment-related expenses, Mr. Keller routinely used his personal credit cards to pay for the items. Thus, when money was taken from the surplus for reimbursement, Mr. Keller directed that the money be paid directly to his creditors. Mr. Keller estimates that these work-related reimbursements from the surplus total approximately 35 percent of the $120,748.78 total. Mr. Keller maintains that these were legitimate New York Life-related business expenses that should not be included in the amount of the loss. Thus, after subtracting 35 percent, the total loss is $78,486.71.

Additionally, Mr. Keller maintains that any monies paid for LASIK eye surgery that he underwent should not be included in any loss calculation as the Government has asserted on prior occasions. Although a discussion of Mr. Keller's LASIK eye surgery does not appear in the Presentence Report or in the Indictment, the Government has previously raised the issue that Mr. Keller improperly used monies from the surplus to pay for the surgery. Based on the Government's prior assertions, Mr. Keller addresses this issue here. Mr. Keller's LASIK surgery was paid for by Flex Dollars taken from Mr. Keller's Medical Savings Account, which was part of Mr. Keller's insurance plan at New York Life. In 1997 and 1998, Mr. Keller filled out forms at New York Life to put away $5,211.00 and $5,573.00 in pre-tax Flex Dollars. *See* Exhibits 1 and 2, attached hereto. Money was taken from Mr. Keller's Flex Dollars account in order to fund the LASIK eye surgery. Thus, Mr. Keller paid for the surgery from these funds, not from the surplus at issue in this case.

### B.    Guidelines Calculation

Based upon Mr. Keller's estimation as to the amount of the fraud loss at $78,486.71, his offense level is calculated as follows. The two offenses of mail fraud and conspiracy to defraud the IRS are grouped pursuant to U.S.S.G. § 3D1.2(d). The offense level for the group is then determined pursuant to U.S.S.G. § 3D1.3(b) by aggregating the amount of the loss under both offenses and applying the offense guideline that produces the highest offense level. In other words, the mail fraud loss

13

is added to the tax count loss; then, the table that produces the highest offense level

as to the total amount of this aggregated loss is used to determine the offense level.

In the present case, the tax loss is determined by taking the total unreported

income from 1999 and 2000 ($78,486.71)[2] and multiplying it by the highest tax rate

of 39.6 percent.  *See* U.S.S.G. § 2T1.1(c)(1)(A) (tax loss is computed by multiplying

the unreported gross income by 28 percent unless a more accurate determination of

the tax loss can be made).  In this case, 39.6 percent is used rather than 28 percent

because Mr. Keller was in the highest tax bracket.  Therefore, using the rate of 39.6

percent is a more accurate means to determine the tax loss as contemplated by

U.S.S.G. § 2T1.1(c)(1)(A).  Thus, the tax loss in this case is $31,080.74 (39.6

percent of $78,486.71).

Aggregating the fraud loss and the tax loss yields a total loss of $109,567.45

($78,486.71 + $31,080.74).  The offense levels applicable to this amount under *both*

the fraud table and the tax loss table are then compared to determine which table

produces the highest offense level.  Pursuant to U.S.S.G. § 2F1.1(a), the base

offense level under the mail fraud count for a loss of $109,567.45 is six.  Six levels

are added pursuant to § 2F1.1(b)(1)(G) for a loss exceeding $70,000 but less than

$120,000.  Mr. Keller contests the Government's addition of two levels for more than

minimal planning pursuant to § 2F1.1(2)(A).  *See* Part IV.C. *infra* (discussion of

---

[2] Mr. Keller's total unreported income is only that portion of the monies made payable to him or his
creditors that did *not* constitute reimbursement for business expenses.

14

downward departure based on aberrant behavior).  Thus, pursuant to the fraud

calculation, Mr. Keller's Total Offense Level is 12.

Pursuant to U.S.S.G. § 2T4.1(I), the offense level for a tax loss of

$109,567.45 is 14.  Two levels are added under § 2T1.1(b)(1) for failure to report or

correctly identify the source of the income exceeding $10,000 in any year from

criminal activity.  Thus, pursuant to the tax loss table, Mr. Keller's Total Offense

Level is 16.

Because the table that produces the highest offense level as to the total

amount of the loss is used to determine the offense level applicable to grouped

offenses under § 3D1.3(b), the Total Offense Level in this case is 16, which is the

level that is produced pursuant to the tax loss table.  Three levels are then

subtracted under § 3E1.1 for acceptance of responsibility, resulting in a Total

Offense Level of 13.  With a Criminal History Category of I, Mr. Keller's sentencing

range pursuant to the advisory Sentencing Guidelines is 12 to 18 months, along with

a possible fine of $3,000 to $30,000.

IV.  **THE PARTICULAR FACTS AND CIRCUMSTANCES OF THIS CASE AS WELL AS THE CHARACTER OF MR. KELLER AND COMPELLING CONSIDERATIONS WARRANT THIS COURT TO IMPOSE A SENTENCE BELOW THAT WHICH IS PRESCRIBED BY THE RECOMMENDED OFFENSE LEVEL.**

A.  **This Court Possesses Authority To Depart From The Guidelines Range.**

Prior to the decision in *Booker*, a district court was required to impose a sentence within the applicable Sentencing Guidelines range. *See* U.S.S.G. Ch. 1, Pt. A, intro., p.s.; 18 U.S.C. §3553(b). Now, the court is not bound by rigid application of the Guidelines.  "The Commission intends the sentencing courts to treat each guideline as carving out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." *See* U.S.S.G. Ch.1, pt.A, intro. comment 4(b); *see also United States v. Bryson*, 163 F.3d 742, 47 (2d Cir. 1998); *United States v. Payton*, 159 F.3d 49, 60 (2d Cir. 1998); *United States v. Rogers*, 972 F.2d 489, 493 (2d Cir. 1992). "When a court finds an atypical case, one to which a particular guideline linguistically applies but where conduct significantly differs from the norm, the court may consider whether a departure is warranted." *Id.*  Although a sentence within the Guidelines range is no longer mandatory, this Court may still consider whether Mr. Keller's case falls within or without the "heartland" of typical cases in determining his sentence.

In forming the Guidelines, the Sentencing Commission did not adequately take into account cases that are, for one reason or another, "unusual." *See Koon v.*

16

*United States*, 518 U.S. 81, 93 (1996) (citing 1995 U.S.S.G. Ch. 1, pt. A, intro.

comment 4(b)). The Commission did not intend, with the exception of certain factors

(race, sex, national origin, creed, religion, socioeconomic status, lack of guidance as

a youth, drug or alcohol dependence, and economic hardship), "to limit the kinds of

factors, whether or not mentioned anywhere else in the Guidelines, that could

constitute grounds for departure in an unusual case." *Koon v. United States*, 518

U.S. at 83 (quoting 1995 U.S.S.G. Ch. 1, pt. A, intro. comment 4(b)).

> In *Koon* the United States Supreme Court further recognized that:
>
> [T]he [Sentencing Reform] Act authorizes the district courts to depart in cases that feature aggravating or mitigating circumstances of a kind or degree not taken into consideration by the Commission.  The Commission, in turn, says it has formulated each guideline to apply to a heartland of typical cases. Atypical cases were not "adequately taken into consideration," and factors that may make a case atypical provide potential basis for departure. Potential departure factors "cannot by their very nature, be comprehensively listed and analyzed in advance." Faced with this reality, the Commission chose to prohibit consideration of only a few factors, and not otherwise to limit, as a categorical matter, the considerations that might bear upon the decision to depart.

*Koon*, 518 U.S. at 94 (internal citations omitted).

In *Koon*, the Court adopted the Commission's summary of the way in which

courts should consider certain factors in determining whether to depart downward.

With respect to factors that might remove a case from the heartland of typical cases,

the Court referred to them as "special factors." "If a special factor is an encouraged

factor, the court is authorized to depart if the applicable guideline does not already

take it into account." *Id.* at 96. On the other hand, "[i]f a special factor is a discouraged factor, or an encouraged factor already taken into account by the applicable guideline, the court should depart only if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present." *Id.* at 96.

The *Koon* Court also recognized the importance of adopting, as a reviewing court, a deferential approach to afford the district court the necessary flexibility to resolve questions involving "multifarious, fleeting, special, narrow facts that utterly resist generalization." *Id.* (citing *Cooter* and *Gell v. Hartmarx Corp.*, 496 U.S. 384(1990)).  The Second Circuit Court of Appeals has agreed with the notion that district courts should be allotted "wide discretion" in determining what aggravating and mitigating circumstances to consider when deciding whether to depart from the Guidelines.  *See United States v. Bryson*, 163 F.3d 742, 746-47 (2d Cir. 1998); *United States v. Payton*, 159 F.3d 49, 60 (2d Cir. 1998); *United States v. Schular*, 907 F.2d 294, 296 (2d Cir. 1990).

In *United States v. Correa-Vargas*, 860 F.2d 35, 37 (2d Cir. 1988), the Second Circuit Court of Appeals stated the following:

> [W]e prefer to allow the district courts to exercise their sound judgment in departing from the Guidelines, rather than impose rigid adherence to a table of numbers, Only by allowing the district courts ***sensible flexibility*** can we promote the equally important purposes of just punishment, respect for the law and adequate deterrence set forth in the Sentencing Reform Act.

18

*United States v. Correa-Vargas*, 860 F.2d at 37 (emphasis added). *See also United States v. Rogers*, 972 F.2d 485, 493 (2d Cir. 1992) ("the authority to depart provides a 'sensible flexibility' to insure that atypical cases are not shoehorned into a Guidelines range that is formulated only for typical cases"). Furthermore, the Second Circuit has noted that "it was not Congress' aim to straitjacket a sentencing court, compelling it to impose sentences like a robot inside a Guidelines' glass bubble, and preventing it from exercising discretion, flexibility or independent judgment."[3] *United States v. Lara*, 905 F.2d 599, 604 (2d Cir. 1990).

Therefore, "[t]he controlling decision as to whether and to what extent departure is warranted can only be made by the courts" at the time of sentencing. U.S.S.G. §5K2.0, p.s.; *See also Rogers*, 972 F.2d at 495 ("the traditional role of the district judge in bringing compassion and common sense to the sentencing process" has survived the guidelines' promulgation); *United States v. Mickens*, 977 F.2d 69, 73 (2d Cir. 1992) (remanding case to give sentencing court "opportunity to fulfill the traditional role of a district judge in bringing compassion and common sense to the sentencing process").

---

[3] Likewise, the Fifth Circuit has noted:

> Sentencing under the Guidelines is not, however, an exact science. Justice cannot be meted out according to mathematical formulas. The universe of potential factors that might affect the seriousness of a given offense is too broad to be refined to a mechanistic approach. The Sentencing Guidelines are not intended to cover all contingencies or rigidly bind district judges. The Guidelines do not impose the sentence, they provide a framework for a district court to impose a sentence.

*United States v. Mejia-Orosco*, 867 F.2d 216, 219 (5th Cir. 1989).

In the present case, the court is required to consider, among other things, the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Analysis of the present offense demonstrates that Mr. Keller's conduct is outside the "heartland" of typical embezzlement cases. As discussed at length above in Part III, Mr. Keller used approximately 35 percent of the funds paid to him from the surplus for legitimate work-related expenses. Additionally, as discussed more fully below, while employed at New York Life, Mr. Keller essentially was a workaholic. He routinely worked 70-plus hour weeks, putting in seven days per week and often staying overnight in New York as a result of working until 11 p.m. For these reasons, Mr. Keller is not the type of embezzler typically seen in the heartland of embezzlement cases.

In *United States v. Ranum*, a post-*Booker* case, the Eastern District of Wisconsin considered the sentencing of a bank loan officer who was convicted by a jury of two counts of misapplication of bank funds and one count of making a false statement. 353 F. Supp. 2d 984, 988-89 (E.D. Wis. 2005). The loan officer extended letters of credit to a bank customer, with whom had had no prior relationship and in whom he had no interest, in excess of his authority. *Id.* at 987-88. The customer could not pay back the loans, and the total loss to the bank was $1,134,000. *Id.* at 988.

In determining the defendant's sentence, the *Ranum* court noted:

> Thus, although the offense was a serious one, I found some of the circumstances surrounding it to be unusual. Defendant's offense level under the advisory guidelines was largely the product of the loss amount. One of the primary limitations of the guidelines, particularly in white-collar cases, is their mechanical correlation between loss and offense level. For example, the guidelines treat a person who steals $100,000 to finance a lavish lifestyle the same as someone who steals the same amount to pay for an operation for a sick child. It is true that, as the government argued in the present case, from the victim's perspective the loss is the same no matter why it occurred. But from the standpoint of personal culpability, there is a significant difference. *See United States v. Emmenegger*, 329 F. Supp.2d 416, 427-28 (S.D.N.Y. 2004) ("Were less emphasis placed on the overly-rigid loss table, the identification of different types of fraud or theft offenses of greater or lesser moral culpability or danger to society would perhaps assume greater significance in assessing the seriousness of difference frauds."). In the present case, the defendant did not act for personal gain. He made loans outside his authority and was reckless with his employer's money. But that is not the same as stealing it. Thus, due to the nature of the case, I found the guideline range, which depended so heavily on the loss amount, greater than necessary.

*Id.* at 990.

In the same manner, in the present case, Mr. Keller did not act solely for personal gain. Although, concededly, a portion of the money went to Mr. Keller personally, as discussed above, a significant amount of the funds were used for the benefit of his employer New York Life.

### B. In Determining Mr. Keller's Sentence, This Court Must Evaluate His Character.

The character of the defendant is a significant factor in the determination of an appropriate sentence and must be taken into consideration by the sentencing court.

21

*See* 18 U.S.C. § 3553(a)(1).  "Contrary to widely held belief, the Sentencing Reform

Act did not abolish consideration of the character of the defendant in sentencing."[4]

*United States v. Merritt*, 988 F.2d 1298, 1307 (2d Cir.), *cert. denied*, 113 S. Ct. 2933

(1993); *see also United States v. DeRiggi*, 45 F.3d 713, 718 (2d Cir. 1994). Rather,

the Court of Appeals for the Second Circuit has noted that "the Act clearly ordered

that the characteristics of the defendant were to be a central consideration in the

fashioning of a just sentence." *Id.; see, e.g.*, U.S.S.G. §1B1.4 (the Commission

provided that in determining whether a departure from the Guidelines is warranted,

the sentencing court may consider, without limitation, any information concerning the

background, character and conduct of the defendant, unless otherwise prohibited by

law); *see also* 18 U.S.C. § 3661.

Further, in another case, the Court of Appeals for the Second Circuit

emphasized that the Sentencing Commission "has not yet completely eradicated

---

[4] *See also* John M. Walker, Jr., Loosening *The Administrative Handcuffs: Discretion And Responsibility Under The Guidelines*, 59 Brooklyn L. Rev. 551 (1993).  In this law review article, Judge Walker wrote, "[o]ur cases make clear that the Guidelines have both transformed judges into computers confined to connecting dots on a grid when fashioning a sentence.  Rather, judges retain the discretion and indeed are required, to consider each defendant as an individual and to fashion each sentence accordingly."  Walker, *supra*, at 553.  He further stated:

> Critics contend that the Guidelines virtually abolish consideration for the defendant's character and, instead, require judges to fashion sentences based largely upon the offense and not the offender.  This view is widely held by district judges and tends to be self-fulfilling.  The unfortunate result is that judges are inadvertently failing to carry out the congressional mandate to consider 'the nature and circumstances of the offense *and the history and characteristics of the defendant* when imposing a sentence.

Walker, *supra*, at 558 (emphasis added).

22

judicial discretion from our system." *United States v. Anderson*, 15 F.3d 278, 280 (2d

Cir. 1994).[5] The Court stated:

> The fact that the Sentencing Reform Act has not completely removed judicial discretion from our system, of course, is for the best; although judicial discretion undoubtedly may result in some sentencing disparities, it is also that which enables our courts to fashion individualized sentences essential to just administration of the criminal law.

*Anderson*, 15 F.3d at 280 (emphasis added).

In *Merritt*, the Court of Appeals examined both the statutory scheme of the

Sentencing Reform Act and the test of the Federal Sentencing Guidelines and

reiterated that a district judge must consider a defendant's individual characteristics.

First, the Court noted that the Senate Report to the Sentencing Act specifically

ordered that the characteristics of the defendant were to be considered in

determining a just sentence. *See Merritt*, 988 F.2d at 1307.  The Senate Report

provided:

> The Committee does not intend that the Guidelines be imposed in a mechanistic fashion.  It believes that the sentencing judge has an obligation to consider all the relevant factors in a case and to impose a sentence outside the Guidelines in an appropriate case.  The purpose of the Sentencing Guidelines is to provide a structure for evaluating the fairness and appropriateness of the sentence for an individual offender, ***not to eliminate the thoughtful imposition of individualized sentences***.

S. Rep. No. 225, 98th Cong., 2d Sess. 52, *reprinted in* 1984 U.S. Code Cong. &

Admin. News 3182, 3236 (emphasis added); *see also Merritt*, 988 F.2d at 1307 n.3;

---

[5] *See also Rogers*, 972 F.2d at 495 ("[i]n the tangled wake of the Sentencing Guidelines, there is a danger that district judges will conclude in frustration that [the traditional role in bringing compassion and common sense to the sentencing process] has been eradicated").

*United States v. Lara*, 905 F.2d at 604 (2d Cir. 1990).

The *Merritt* Court also reviewed 18 U.S.C. § 3553, "[t]he keystone section in the creation of the new sentencing system." Section 3553 provides *inter alia* the following guidelines in imposing sentences:

(a)   Factors to be considered in imposing a sentence. - The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection. The court, in determining the particular sentence to be imposed, shall consider -

  (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;

  (2)   the need for the sentence imposed-

    (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B)   to afford adequate deterrence to criminal conduct;

    (C)   to protect the public from further crimes of the defendant; and

    (D)   to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

The Court focused on the statutory mandate of § 3553(a)(1) that the "characteristics of the defendant" are factors to be considered in imposing a sentence. *Merritt*, 988 F.2d at 1306-07.

The *Merritt* Court also reviewed the Guidelines, Policy Statements, Application Notes, and Commentary formulated by the Sentencing Commission and observed that there is little guidance regarding the use of a defendant's characteristics. Nevertheless, the Court concluded that "the absence of Guideline commands for the defendant characteristics represents the Commission's wise judgment that it is far more difficult to quantify the effect that such characteristics should have on individual sentences, than it is to prescribe relative values to a variety of offenses." *Merritt*, 988 F.2d at 1309.

Accordingly, in the present case, the character of Mr. Keller should be examined and considered in determining a just sentence.

**C.    Because Mr. Keller's Character And Conduct Fall Outside Of The "Heartland" of Guideline Cases, This Court Possesses Authority to Sentence Mr. Keller Below The Guidelines Range On The Basis Of Any Of The Following Asserted Grounds.**

**1.    Mr. Keller's Offense Conduct Was An Aberration**

The circumstances of this case justify a reduced sentence on the basis of aberrant behavior.  The Guidelines provide, "A sentence below the applicable guideline range may be warranted in an extraordinary case if the defendant's criminal conduct constituted aberrant behavior."  U.S.S.G. § 5K2.20.  A court may not depart, however, if the offense (1) involves serious bodily injury or death; (2) the defendant discharged a firearm or otherwise used a firearm or a dangerous weapon; (3) the offense of conviction is a serious drug trafficking offense; (4) the defendant

has more than one criminal history point; or (5) the defendant has a prior federal or state felony conviction.  U.S.S.G. § 5K2.20.

In its application notes, the Commission defines aberrant behavior as "a single criminal occurrence or single criminal transaction that (A) was committed without significant planning; (B) was of limited duration; and (C) represented a marked deviation by the defendant from an otherwise law-abiding life."  U.S.S.G. § 5K2.20 cmt. (n.1).  The application notes also set forth various characteristics of the defendant that the sentencing court may consider in determining whether to depart for aberrant behavior, such as:  "(A) mental and emotional conditions; (B) employment record; (C) record of prior good works; (D) motivation for committing the offense; and (E) efforts to mitigate the effects of the offense."  U.S.S.G. § 5K2.20 cmt. (n.2).  In applying each of these factors to this case, it is apparent that Mr. Keller's conduct constitutes "aberrant behavior."

### a.  Mr. Keller's Conduct Is Within The Guidelines' Definition Of "Aberrant Behavior"

Mr. Keller's offense, was a "single criminal occurrence" or a "single criminal transaction."  *See* U.S.S.G. § 5K2.20 cmt. (n.1).  Although the conduct occurred over a period of time, it was a single criminal transaction because it was one criminal scheme.  *See United States v. Hued*, 338 F. Supp.2d 453, 458 (S.D.N.Y. 2004) ("Furthermore, the Sentencing Commission has, in other contexts, intended the word "single" to refer to the crime committed and not to the various acts involved.")

26

(internal quotations omitted). Additionally, Mr. Keller's acts were committed without a plan to defraud New York Life. For these reasons, Mr. Keller's acts were "of limited duration." *See* U.S.S.G. § 5K2.20 cmt. (n.1). Finally, Mr. Keller's conduct "represented a marked deviation by the defendant from an otherwise law-abiding life." *See id.* As the Presentence Report indicates, Mr. Keller has no criminal convictions and zero criminal history points. Thus, Mr. Keller's conduct fits squarely within the Guidelines' definition of "aberrant behavior."

> **b.    The Characteristics Of The Defendant Warrant The Application Of The Aberrant Behavior Departure**

As indicated above, the sentencing court is permitted to take various characteristics of the defendant into account in determining the application of the aberrant behavior departure. *See* U.S.S.G. § 5K2.20 cmt. (n.2). Considerations of these characteristics as they apply to Mr. Keller demonstrate that the departure is appropriate in this case.

> **1.    Mental And Emotional Condition**

During the time period between 1997 and 2000, which includes the time period relevant to the instant offenses to which Mr. Keller has plead guilty, Mr. Keller was going through a difficult period in his life in that someone very close to him was experiencing substantial mental health issues that included many hospitalizations at mental health facilities. Mr. Keller does not wish to provide many details due to the sensitive nature of this information and to protect the identity of the person

undergoing these severe problems. However, during this time, he was the sole source of emotional support to this person in relation to these very serious difficulties. This, in turn, took quite a toll on Mr. Keller. It was during this very stressful period in his life that the instant offense was committed. These emotional factors that existed at the time caused Mr. Keller to bow to a lapse in judgment and commit the instant offense.

### 2.    Employment Record

Prior to the incident that gives rise to the present charges, Mr. Keller enjoyed a law-abiding life and an unblemished work history characterized by a remarkable work ethic. Everyone who knows Mr. Keller comments on his long history of hard work. His sister, Suzanne Gomes, writes:

> For as long as I can remember, Bobby has been a really hard worker. My mom will tell you, that when she was a teen, her family was so poor, that they had no bathroom, only an outhouse, and that they grew or raised almost all of their own food. She made sure we had a better childhood than she did, and encouraged us all to work hard. Bobby really took this to heart. Looking back, he was the hardest working kid I've ever seen. Today's kids should work half as hard! When I was little, his entrepreneurial spirit landed him all kinds of jobs, from newspaper delivery to selling [b]ooks and [k]erosene heaters. He wasn't the kind of kid to just sit around. Even at my young age, I remember him striving to better himself. He was so different than all of the other kids in the neighborhood. His success inspired me, and he played a huge role in getting me to go to college.

*See* Letter of Suzanne Gomes, at p. 1-2, attached hereto as Exhibit 3.

Mr. Keller's other sister, Cheryl Vidal, describes Mr. Keller's hard working tendencies which began during his childhood:

> I'll start when my brother was around 12 years old and started to mow lawns in the neighborhood and do yard work so he could earn enough money to buy a "ride on tractor" so our father didn't have to worry about mowing the lawn with an old push mower, after working all week.  (Of course my brother used to do the lawn for our father anyways).  When Bob was old enough to drive and own a car, he began working for our uncle who owned and operated a septic tank pumping and [installation] company in Greenwich, Connecticut (not a lot of glory in that, but definitely a lot of hard work).  While working for our uncle, Bob lived with our grandmother in Riverside, Connecticut. While living with our grandmother he helped her take care of her house inside as well as the outside.  Bob always had the drive to work hard for everything, even at a young age.

See Letter of Cheryl Vidal, at p. 2, attached hereto as Exhibit 4.

A friend writes of Mr. Keller, "He is a dynamic energetic results oriented person.  His day starts at 4:30 a.m. and he works, works, works….cooking, cleaning, taking care of the animals, splitting wood, and cutting grass, house repairs, house renovations and then maintains his full time job at the Trading Post."  See Letter of Patricia Lipovsky-Sell, at p. 1, attached hereto as Exhibit 5.

Mr. Keller's prior work history also demonstrates his drive to succeed and his strong work ethic.  Although Mr. Keller did not complete college, he obtained a position at Uniroyal Chemical and Rubber in 1980 as a computer network analyst, and consistently worked his way up through various jobs and companies until he achieved the position of Assistant Vice President at Midlantic Bank in 1994, Vice

President of M&I Data in 1995, and Vice President at PNC Bank Corporation in

1996.  Mr. Keller has been a dedicated and hardworking employee at all of his

positions, putting in extremely long hours.  One friend notes, "Bob was never afraid

to work.  He has always put in numerous hours for whatever employer he has

worked for."  *See* Letter of John Feulner, attached hereto as Exhibit 6.

At New York Life, Mr. Keller consistently performed well above expectations,

typically earning the highest possible rating in his employment evaluations.[6]

Employees were rated overall from one to five, with one being the highest overall

rating.  Mr. Keller achieved ratings of one for 1998 and 1999, which represented,

"Overall, the individual has substantially exceeded requirements of the position

and/or successfully met very difficult objectives.  Demonstrated notable strength in

most skills/behaviors and made significant contributions to the business unit."  *See*

1998 Performance Review, attached hereto as Exhibit 7; 1999 Performance Review,

attached hereto as Exhibit 8.  Mr. Keller's 1999 evaluation states, "Bob is a leader

who knows how to get other motivated and working toward a common goal.  …  He

sets high standards and lets his team know he will accept no less."  *See* Exhibit 8, at

p. 9 (Bates No. 00113).  Also, as discussed above, Mr. Keller was an extremely

---

[6] At first glance, one might tend not to put tremendous stock in Mr. Keller's employment evaluations at New York Life because they were prepared by co-defendant Michael Mazzariello.  However, the final rating that an employee receives on his evaluation is the product of voting by supervisors across many different departments.  Because only a certain number of top ratings are permitted in each pay grade across all departments, supervisors across different departments must get together to make the final determination.  Thus, Mr. Keller's top ratings were awarded not just by Mr. Mazzariello, but by a committee of supervisors.

dedicated employee, typically working in excess of 70 hours per week, including weekends.  In addition to glowing employment evaluations, Mr. Keller also enjoyed many raises and bonuses at New York Life for his hard work.

Mr. Keller currently maintains full time employment at the Trading Post, a store that specializes in the sale of custom spas, hearth products, and paddle sports products.  When Mr. Keller started at the Trading Post in April, 2001, he was the fourth employee.  Under Mr. Keller's guidance, the store grew to 14 employees.  Prior to his tenure, the Trading Post did approximately $400,000 in sales in 2000.  In four years, Mr. Keller has exponentially increased the company's sales to $2.7 million in 2004.

Mr. Keller's current employers describe his many contributions at the Trading Post:

> Bob began with us full time approximately three years ago, as general manager.  He's helped our business to grow very rapidly.  He manages almost every aspect of the business.  He runs our day to day operations, future planning, events, purchasing, finances, bookkeeping, and sales force.  This just begins to list what Bob does for us & our business.  Bob puts a lot of effort, love & passion into how he cares for our business, as though it were his own.  Bob has always proved to be exceptionally trustworthy and dependable.  We would be in serious trouble should we not have Bob Keller with us to keep operations running smoothly.  Bob is irreplaceable to us and the Trading Post.

*See* Letter of Dave and Roxanne Lord, at p. 2, attached hereto as Exhibit 9.

### 3.    Record Of Prior Good Works

Mr. Keller's commitment to good works is evident.  His good deeds are also recognized by his family.  Mr. Keller helps take care of his elderly father who suffers from eye problems that have caused him to lose some of his vision.  As Mr. Keller's mother still works approximately 30 hours per week, Mr. Keller assists his father and mother in many ways, including with upkeep of their home.  His sister Cheryl writes:

> Bob is the backbone of our family.  With our younger sister, Suzanne, suffering from fibromyalgia, a disease that limits her mobility and myself having double rotator cuff surgery with nerve damage to my right hand and shoulder due to an injury I received at my job in nursing, Bob has had to take on the role of care taker for our parents.  Our Dad has lot close to half of the vision in both of his eyes due to Ischemic Optic Neuropathy.  In short this is lack of blood supply to the optic nerve in both eyes. …  Our Dad had to stop working and driving all in a week's time and to further complicate things he also has diabetes.

See Letter of Cheryl Vidal, at p. 1, attached hereto as Exhibit 4.  Mr. Keller's sister describes the multitude of assistance that Mr. Keller provides to his father and mother and concludes:

> Our Dad is not ready to give up his independence, understandably so, but he doesn't remember things like he used to, and some of the most simple of tasks, are becoming very difficult for our Dad to do.  It isn't so easy to stop him from doing something when he has his [mind set] to do it even when you think he may get hurt doing it.  Our Dad has come to let my brother do a lot of these things for him.  Bob is always there whenever he needs to go to a Dr.'s appointment, the store, whatever. Bob does anything and everything for them and anyone else for that matter.

See Letter of Cheryl Vidal, at p. 1, attached hereto as Exhibit 4.

Mr. Keller's other sister Suzanne describes how Mr. Keller consistently helps her and her family out as she is debilitated by fibromyalgia, a musculoskeletal disease.  His sister writes:

> There are some days that I can function at almost a normal level, and then there are the days that I can barely get out of bed.  These are the days when my brother jumps right in.  I never have to ask him, he just does it.  It's in his nature.  He will walk the dogs for me, run errands, do yard work, go grocery shopping, pick up prescriptions, do house-cleaning, and help out with my sixteen month old daughter.  I can't imagine the amount of work my husband would miss if Bobby wasn't able to help out.  Most likely, I would end up applying for disability.

*See* Letter of Suzanne Gomes, at p. 2-3, attached hereto as Exhibit 3.

In addition to helping his family, Mr. Keller's is dedicated to his community.  For example, he adopts a family every year from the women's shelter at Thanksgiving, providing them with a full Thanksgiving dinner.  Additionally, every year, Mr. Keller also provides one or two mothers and their children with a complete Christmas dinner and buys the children all of the presents that they have put on their lists to Santa.  *See* Letter of Suzanne Gomes, at p. 2, attached hereto as Exhibit 3; Letter of Cheryl Vidal, at p. 2, attached hereto as Exhibit 4.  Mr. Keller, an avid kayaker, also donates much of his free time to cleaning up Candlewood Lake and other kayaking trails.  *See* Letter of Cheryl Vidal, at p. 2, attached hereto as Exhibit 4.  His current employer describes his community involvement:

> Bob Keller is also considered, by many, to be an outstanding member & contributor to our community.  He helps to run community events such as Paddle Days, Paddle Club, Kings Mark, and HVPA.  Bob organized and began the now successful organization, The Paddle

Club, because the community needed one and no one else could figure out how to get one started.  After three years, the Club is now running on its own.

*See* Letter of Dave and Roxanne Lord, at p. 3, attached hereto as Exhibit 9.

Mr. Keller's sister also describes one particularly memorable event involving

Mr. Keller's generosity in the community:

> My brother's generous spirit is evident to me on almost a daily basis, but there are some things that stand out in my mind as being exceptionally special.  On Christmas, an elderly woman came into the store where he is currently the General Manager.  She had been in a few times and Bobby knew her name.  She would buy a few bags of wood pellets for her stove at a time.  He said, "Mrs. Smith, it would be less money for you if you bought 1 ton of pellets at a time."  The woman explained that not only was she on a fixed income, but her husband had just had his fifth heart attack and, after paying for his medicines, this was all the money she could manage right now.  Bobby had a talk with the very generous store owner, and a few days later the woman came home and found a ton of wood pellets stacked neatly in her garage, with a note from Santa wishing her a merry Christmas.

*See* Letter of Suzanne Gomes, at p. 2, attached hereto as Exhibit 3.

### 4.    Motivation For Committing The Offense

Mr. Keller's actions were not motivated by a desire to do harm.  Rather, much of his conduct was the result of following an established practice of pre-payment within his department at New York Life.  As discussed above, a large amount of the monies in the surplus were used for legitimate business-related expenses; even as to the monies paid directly to Mr. Keller, 35 percent of those funds were used for business purposes.  Mr. Keller did not set out to defraud New York Life.

34

### 5.    Efforts To Mitigate The Effects Of The Offense

Mr. Keller has made efforts to mitigate the effects of his offense.  He has accepted responsibility for his actions.  In fact, the Government has agreed to recommend a three-level departure pursuant to Section 3E1.1(a) of the Guidelines for Mr. Keller's acceptance of responsibility.

For all of the above reasons, Mr. Keller submits that a sentence lower than the Guidelines level is appropriate because his actions constituted aberrant behavior.

### 2.    Mr. Keller's Has Performed Extraordinary Charitable And Employment-Related Contributions And Numerous Good Deeds.

A person's history of charitable and employment-related contributions and/or "good deeds" are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range. *See* U.S.S.G. § 5H1.11. However, factors such as charitable contributions and good deeds may be a basis for departure if the factor is present to an exceptional degree or in some other way makes the case different from the ordinary case where the factor is present. *Koon v. United States*, 518 U.S. 81, 96 (1996); *see also United States v. Crouse*, 145 F.3d 786 (6th Cir. 1998) (civic work was a permissible ground for the district court to consider in departing downward).

In *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996), the Court of Appeals for the Second Circuit held that the District Court did not abuse its discretion

by departing downward from level 20 to a level 10, in part on the basis of Rioux's charitable efforts and civic good deeds, which included fundraising for the Kidney Foundation. *See Rioux*, 97 F.3d at 663; *see also United States v. Woods*, 159 F.3d 1132, 1136 (8th Cir. 1998) (defendant's charitable efforts of bringing two troubled young women into her home and sending them to private schools, along with her assistance with moving an elderly friend from a nursing home to an apartment where she helped to care for him, constituted exceptional charitable efforts and supported a one level downward departure from the guidelines).

Because Mr. Keller's *numerous* charitable, civic and employment-related contributions have been exceptional, a downward departure is justified.  As discussed in Part IV.C.a., *supra*, his life-long efforts are documented by his family, friends and business associates.  As discussed at length above, Mr. Keller routinely goes out of the way in donating his time and resources to the community, whether it be to residents at the women's shelter, low income patrons of the store where Mr. Keller works, in donating his time and services to members of his family and friends, or as the organizer of various civic groups.  *See* Letter of Suzanne Gomes, attached hereto as Exhibit 3; Letter of Cheryl Vidal, attached hereto as Exhibit 4; Letter of Dave & Roxanne Lord, attached hereto as Exhibit 9; Letter of Diane Disher, attached hereto as Exhibit 10.

Accordingly, Mr. Keller's significant and extraordinary contributions to the community should be considered and properly weighed when imposing sentence and they support a downward departure in this case.

### 3. There Are Extraordinary Family Circumstances Present.

Under U.S.S.G. § 5H1.6, "[f]amily ties and responsibilities and community ties are not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range." Nevertheless, "[i]n this circuit a district court may depart downward in sentencing a defendant due to extraordinary family circumstances." *United States v. Walker*, 191 F.3d 326, 338 (2d Cir.1999); *see also United States v. Sprei*, 145 F.3d 528, 535 (2d Cir.1998) ("We have in the past upheld departures based on family circumstances where the family was uniquely dependent on the defendant's ability to maintain *existing financial and emotional commitments*.") (emphasis added); *United States v. Johnson*, 964 F.2d 124 (2d Cir. 1992) (affirming district court's determination that extraordinary family circumstances and responsibilities warranted a ten level downward departure); *United States v. Alba*, 933 F.2d 1117 (2d Cir. 1991) (the district court's reliance upon the defendant's family circumstances wherein he supported his wife, two children, his mother and disabled grandfather by working two jobs constituted legitimate ground for downward departure from the guideline range of 41-51 months to six months in a halfway house).

37

In this case, Mr. Keller is an essential aide to his father due to the elder Keller's health problems.  Mr. Keller's father relies on Mr. Keller considerably due to the degenerative eye disease that has rendered him blind in one eye and his diabetes.  Because Mr. Keller's mother still works outside of the home, Mr. Keller Sr. requires the assistance of Mr. Keller in caring for him, driving him to medical appointments or anywhere else he needs to go, as well as with the maintenance and upkeep of the house.

Mr. Keller's sister Cheryl writes:

> Bob is the backbone of our family.  With our younger sister, Suzanne, suffering from fibromyalgia, a disease that limits her mobility and myself having double rotator cuff surgery with nerve damage to my right hand and shoulder due to an injury I received at my job in nursing, Bob has had to take on the role of caretaker for our parents.

See Letter of Cheryl Vidal, at p. 1, attached hereto as Exhibit 4.  Mr. Keller's other sister Suzanne describes how her parents would be "lost without their only son."  See Letter of Suzanne Gomes, at p. 1, attached hereto as Exhibit 3.   His sister Cheryl further states:

> Our Dad is not ready to give up his independence, understandably so, but he doesn't remember things like he used to, and some of the most simple tasks, are becoming very difficult for our Dad to do.  It isn't so easy to stop him from doing something when he has his mindset to do it even when you think he may get hurt doing it.  Our Dad has come to let my brother do a lot of these things for him.  Bob is always there for him whenever he needs to go to a Dr.'s appointment, the store, whenever.  Bob does anything and everything for them and anyone else for that matter.

*See* Letter of Cheryl Vidal, at p. 1, attached hereto as Exhibit 4.

Mr. Keller is also vital in assisting his sister Suzanne with her fibromyalgia. She writes, "There are some days that I can function at almost a normal level, and then there are the days that I can barely get out of bed. These are the days when my brother jumps right in. I never have to ask him, he just does it. It's in his nature." *See* Letter of Suzanne Gomes, at p. 2, attached hereto as Exhibit 3. His sister Suzanne also states that if it were not for Mr. Keller, she would likely have to begin collecting disability, for which she is eligible but has never attempted to collect. *See Id.*

Clearly, Mr. Keller provides significant assistance to his family. If a period of incarceration is meted out, the emotional impact upon Mr. Keller's family will be extraordinary. Therefore, in light of Mr. Keller's commitment to his family and their health issues, a sentence below the Guidelines range is warranted based upon his extraordinary family circumstances.

### 4.     A Combination Of Factors.

The Sentencing Commission contemplated that a combination of factors could warrant a downward departure, by stating that:

> The Commission does not foreclose the possibility of an extraordinary case that because of a combination of such characteristics or circumstances, differs significantly from the heartland of cases covered by the guidelines in a way that is important to the statutory purposes of sentencing, even though none of the characteristics or circumstances individually distinguishes the case.

U.S.S.G. §5K2.0, commentary.

The Second Circuit has determined that a combination of factors may constitute a "circumstance" that has not been adequately taken into consideration by the Guidelines.  *See, e.g., United States v. Jagmohan*, 909 F.2d at 65 (2d Cir. 1990) (combination of employment record and unusual circumstance of commission of offense); *United States v. Broderson*, 67 F.3d 452, 458 (2d Cir. 1995). *See also United States v. Cook*, 938 F.2d 149, 153 (9th Cir. 1991) ("There is no reason to be so literal-minded as to hold that a combination of factors cannot together constitute a mitigating circumstance. [A] unique combination of factors may constitute the 'circumstance' that mitigates").

In *United States v. Rioux*, the Second Circuit recognized that "[i]n extraordinary cases,...the district court may downwardly depart when a number of factors that, when considered individually, would not permit a downward departure, combine to create a situation that differs significantly from the 'heartland' cases covered by the Guidelines." *Rioux*, 97 F.3d at 663 (citing U.S.S.G. § 5K2.0 cmt.).[7]

While Mr. Keller submits that the factors enumerated in this memorandum constitute a basis for a sentence below the Guidelines range independently, they certainly warrant such a sentence when considered in conjunction with one another and with the other information provided in herein.  First, in addition to aberrant

---

[7] In *United States v. Rioux*, 97 F.3d 648, 663 (2d Cir. 1996), the Court of Appeals for the Second Circuit held that the District Court did not abuse its discretion by departing downward from level 20 to a level 10, in part on the basis of Rioux's charitable efforts and civic good deeds, which included

behavior, Mr. Keller's extraordinary charitable and work-related contributions and his family circumstances, it is important to note that he has lived an exemplary life, provided acts of kindness to those around him, and has been an honest and trustworthy contributing member of society.

Many different people comment on Mr. Keller's integrity. His brother-in-law writes:

> Bobby epitomizes all of the qualities you would expect to find in an elder sibling. He is one of the most honest and trustworthy individuals that I have ever known; few are so true to their word. He is also a devoted and caring family man. When his parents (and siblings, for that matter) are in a bind or need help, Bobby is usually there before he's even asked. When his ex-wife was diagnosed with serious health issues, Bobby never wavered, never questioned, and never complained. That wouldn't be like him. It's not in his nature to do so. A responsible person like Bobby wouldn't handle it any other way.

*See* Letter of Al J. Gomes, attached hereto as Exhibit 11. As Mr. Keller has earned the respect and admiration of so many, it is no wonder that four different people have asked him to be the godfather to their children. *See* Letter of Suzanne Gomes, at p. 3, attached hereto as Exhibit 3; Letter of Cheryl Vidal, at p. 2, attached hereto as Exhibit 4; Letter of John Fuelner, attached hereto as Exhibit 6; Letter of Robin J. Smith, attached hereto as Exhibit 12. Additional letters of support for the Court's consideration are attached hereto as Exhibits 13 through 15.

---

fundraising for the Kidney Foundation. *See Rioux*, 97 F.3d at 663.

In light of Mr. Keller's significant contributions and activities, as well as for all the reasons stated herein, he respectfully submits that a sentence below the Guidelines range is warranted based upon a combination of factors.

## V.    CONCLUSION

As recognized by the Court of Appeals for the Second Circuit in *United States v. Merritt*, 988 F.2d at 1039, "departure in the appropriate case is essential to the satisfactory functioning of the sentencing system."  This is especially true in the post-*Booker* era.  Based upon the articulated reasons *supra*, the instant case is an appropriate case for a sentence below the Guidelines range. Therefore, due to the exemplary history and characteristics of Mr. Keller, the unique facts and circumstances of this case, and the fact that there is no need to protect the public from him, the appropriate sentence which will provide "just punishment" is a sentence of probation.

**THE DEFENDANT,**
**ROBERT L. KELLER, JR.**

By _____
HUBERT J. SANTOS
Federal Bar No. 00069
SANDRA L. SNADEN
Federal Bar No. 18586
SANTOS & SEELEY, P.C.
51 Russ Street
Hartford, CT 06106
Tel. (860) 249-6548
Fax (860) 724-5533

**C e r t i f i c a t i o n**

THIS IS TO CERTIFY that a copy of the foregoing was hand-delivered and/or mailed, first class and postage prepaid, to the following counsel of record and interested persons on March 22, 2005:

Anastasia M. Enos, Esq.
Assistant United States Attorney
450 Main Street
Room 302
Hartford, CT  06103

David T. Grudberg, Esq.
Jacobs, Grudberg, Belt, Dow & Katz, P.C.
350 Orange Street
P.O. Box 606
New Haven, CT  06503-0606

Ms. Jacqueline Carroll
U.S. Probation Officer
157 Church Street, 22nd Floor
New Haven, CT 06510


_____
HUBERT J. SANTOS